## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

DANIEL E.S.,                                    Court File No.:  18-cv-03069 (MJD/ECW)

            Plaintiff,

v.                                                        **REPORT AND RECOMMENDATION**

ANDREW M. SAUL,
Commissioner of Social Security,

            Defendant.

---

This matter is before the Court on Plaintiff Daniel E.S.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 12) and Defendant Commissioner of Social Security Andrew Saul's ("Defendant") Motion for Summary Judgment (Dkt. 14).  Plaintiff filed this case seeking judicial review of a final decision by Defendant denying his application for disability insurance benefits.  This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons discussed below, the Court recommends that Plaintiff's Motion be granted in part and denied in part, and Defendant's Motion be denied.

## I.      BACKGROUND

On April 10, 2017, Plaintiff filed an application for Disability Insurance Benefits, alleging disability as of October 5, 2016, later amended to March 10, 2017.  (R. 160-

166.)[1]  His application was denied initially and on reconsideration.  (R. 63-74, 77-87.)

Plaintiff filed a written request for a hearing, and on May 21, 2018, Plaintiff appeared and

testified at a hearing before Administrative Law Judge Richard Stewart Alford ("ALJ").

(R. 17, 33.)

The ALJ issued an unfavorable decision on June 12, 2018, finding that Plaintiff

was not disabled.  (R. 17-28.)

Following the five-step sequential evaluation process under 20 C.F.R. §

404.1520(a),[2] the ALJ first determined at step one that Plaintiff had not engaged in

substantial gainful activity since March 10, 2017, the amended date of disability.  (R. 19,

183.)

At step two, the ALJ determined that Plaintiff had the following severe

impairments: history of complicated retinal detachment, missing lens, aphakia, and band

keratopathy, right eye, requiring multiple surgeries, including intraocular lens with

---

[1]    The Social Security Administrative Record ("R.") is available at Dkt. 11.

[2]    The Eighth Circuit described this five-step process as follows:

The Commissioner of Social Security must evaluate: (1) whether the
claimant is presently engaged in a substantial gainful activity; (2) whether
the claimant has a severe impairment that significantly limits the claimant's
physical or mental ability to perform basic work activities; (3) whether the
claimant has an impairment that meets or equals a presumptively disabling
impairment listed in the regulations; (4) whether the claimant has the residual
functional capacity to perform his or her past relevant work; and (5) if the
claimant cannot perform the past work, the burden shifts to the
Commissioner to prove that there are other jobs in the national economy that
the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

anterior vitrectomy in March 2014 and corneal endothelial transplantation; diminished vision, right eye; peripheral vision loss, both eyes; and status post retinal detachment repair surgery, left eye.  (R. 19-20.)

At the third step, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 21.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform a range of work at all levels of exertion, but with the following nonexertional limitations: may perform work that requires no more than frequent near acuity, far acuity, depth perception, accommodation, and field of vision; can only read 14-point font type size or greater; no work that requires precise depth perception such as threading a needle; is able to avoid ordinary hazards in the workplace; and no work that requires driving or the operation of a motorized vehicle[.]

(R. 22.)

At the fifth step of the sequential analysis, and based on the testimony of the vocational expert ("VE"), the ALJ found that through the date last insured, considering the Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy including:

- Cleaner, DOT code 323.687-014, light level of exertion, unskilled skill level;

- Laundry worker II, DOT code 361.685-018, medium level of exertion, unskilled skill level; and

- Inspector, DOT code 559.687-074, light level of exertion, unskilled skill level.

(R. 27.)  Pursuant to SSR 00-4p, the ALJ represented that he had determined that there was no apparent unresolved conflict between the VE's testimony and the information contained in the Dictionary of Occupational Titles.  (R. 27.)  Accordingly, the ALJ deemed Plaintiff not disabled. (R. 28.)

Plaintiff requested review of the decision, and the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-5.)  Plaintiff then commenced this action for judicial review.

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    RELEVANT RECORD

### A.    Medical Record

On April 15, 2016, Plaintiff saw his treating ophthalmologist, Daniel Skorich, M.D., related to his vision.  Dr. Skorich noted that as it related to Plaintiff's right eye, he had a history of retinal detachment with multiple surgeries, descemet stripping automated endothelial keratoplasty procedure ("DSAEK"),[3] and pseudophakia.[4]  (R. 255.)  His

---

[3]    DSAEK "is a partial thickness cornea transplant procedure that involves selective removal of the patient's Descemet membrane and endothelium, followed by transplantation of donor corneal endothelium in addition to donor corneal stroma."  *See* https://webeye.ophth.uiowa.edu/eyeforum/tutorials/Cornea-Transplant-Intro/4-DSAEK.htm.

[4]    Pseudophakia: "An eye in which the natural lens is replaced with an intraocular lens."  STEADMAN'S MEDICAL DICTIONARY, 1592 (28th ed. 2006).

vision in his right eye was about 20/100, but had gone up to as good as 20/80, and Dr. Skorich noted it was very stable.  (R. 255.)  According to Dr. Skorich, "[l]eft eye sees very well."  (R. 255.)  Plaintiff inquired about a disability rating.  (R. 255.)  Plaintiff was still able to work and had a waiver for his job, but Dr. Skorich noted that he certainly had subnormal vision given his occupation as a driver.  (R. 255.)  The plan was to see Plaintiff again in six months.  (R. 255.)

Plaintiff next saw Dr. Skorich on March 10, 2017.  (R. 250-52.)  Plaintiff complained of a recent floater change on his better left eye.  (R. 252.)  Dr. Skorich noted that Plaintiff's right eye graft remained clear but that he had subnormal vision in his right eye.  (R. 252.)  Dr. Skorich found that Plaintiff's vision in his left eye was good with some vitreous syneresis and floaters.  (R. 252.)  There was no evidence of retinal tears or retinal detachment.  (R. 252.)

On March 29, 2017, Plaintiff saw Dr. Skorich related to the onset of some new flashers towards the center of his vision in his left eye and some more floaters in the left eye.  (R. 247-50.)  The examination of Plaintiff showed no signs of retinal tears or retinal detachment.  (R. 250.)  Plaintiff was reassured by Dr. Skorich, as the issues were occurring in his better left eye.  (R. 250.)

Plaintiff again reported floaters and flashes in his left eye on April 11, 2017.  (R. 295.)

On April 13, 2017, M. Jerry Mariano, M.D., diagnosed Plaintiff with a retinal tear and detachment of the left eye, with worsening posterior vitreous detachment.  (R. 279.)  Dr. Mariano noted that Plaintiff's uncorrected vision on his left eye was 20/20 -2.  (R.

279.)  On April 14, 2017, Plaintiff was seen by Sarah Galchus, M.D.  (R. 316.)  The fundus examination for Plaintiff's left eye was normal, except for a peripheral retinal tear.  (R. 316.)  The slit lamp exam was normal except for a retinal detachment and a pseudophakia left eye intact posterior capsule as to his lens.  (R. 316.)  The vision in Plaintiff's right eye was 20/150 and the vision in his left eye was 20/25.  (R. 316.)

Plaintiff underwent a retinal detachment surgery for his left eye on April 14, 2017. (R. 284.)

Almost a week later, on April 20, 2017, Plaintiff reported to an ophthalmic assistant that he had cloudy vision and "debris" in his left eye after the surgery.  (R. 292.) The vision in Plaintiff's right eye was 20/200, the vision in his left eye was 20/150, and the vision as to both eyes was 20/150.  (R. 325.)

His vision for his left eye was again rated at 20/150 on April 28, 2017.  (R. 330.) Plaintiff noted blurred vision, but that his near-sighted vision was good.  (R. 330.)

On May 5, 2017, Plaintiff reported that he was seeing wobbly lines in his left peripheral vision, but that he was otherwise doing well.  (R. 335.)  The vision in his left eye was 20/150.  (R. 335.)  It appears that he was given a lens prescription during this appointment.  (R. 335.)

On May 19, 2017, State Agency physician Charles Grant, M.D., conducted a medical evaluation based on the existing medical record.  According to Dr. Grant, Plaintiff had a history of retinal detachment of the right eye and on April 14, 2017, had undergone surgery for retinal detachment of the left eye.  (R. 69.)  His uncorrected pre-op acuities were 20/150 OD and 20/20 OS.  (R. 69.)  Dr. Grant also provided "Please flag or

obtain a post-op eye exam Thanks." (R. 69.) Dr. Grant noted that Plaintiff complained on May 5, 2017 of new floaters in the left eye, but that Plaintiff's vision was not worse. (R. 69.) There was a concentric peripheral field loss on the right, but fields were full on the left. (R. 69.) Dr. Grant's visual limitations for Plaintiff included an unlimited ability as to near acuity, far acuity, accommodation, color vision; and was rated as limited with respect to his depth perception and limited as to his right eye field of vision. (R. 71.) Dr. Grant opined that Plaintiff's perception was impaired due to asymmetric vision loss and that Plaintiff should avoid work for which depth perception was critical for job performance and safety. (R. 71.)

As of June 12, 2017, vision in Plaintiff's right eye was 20/125 and the vision in his left eye was 20/20 -2 with corrective lenses. (R. 371.) It was noted that Plaintiff's disability lawyer would be calling Dr. Galchus regarding his disability. (R. 371.)

On July 10, 2017, State Agency physician Cliff Phibbs, M.D., examined Plaintiff's medical record on reconsideration. (R. 84.) Like Dr. Grant, Dr. Phibbs's visual limitations for Plaintiff included an unlimited ability as to near acuity, far acuity, accommodation, color vision; and concluded that Plaintiff was limited as to his depth perception and limited as to his right eye field of vision. (R. 84.) Dr. Phibbs opined that Plaintiff's perception was impaired due to asymmetric vision loss and that he should avoid work for which depth perception was critical for job performance and safety. (R. 84.)

On July 13, 2018, Dr. Skorich filled out a medical source statement regarding Plaintiff's ability to do physical work-related activities. (R. 394.) The only limitations

assessed were in the visual category where Dr. Skorich opined that Plaintiff was "LIMITED" with respect to the following: near acuity (clarity of vision at 20 inches or less); far acuity (clarity of vision at 20 feet or more); depth perception (ability to judge distances and spatial relationships so as to see objects where and as they actually are); peripheral vision; and accommodation (adjustment of lens of eye to bring an object into sharp focus). (R. 394.) The only choices were to check either the LIMITED or UNLIMITED boxes on the form. (R. 394.) There is no indication on the form as to what "LIMITED" means. (R. 394.) In terms of the medical findings supporting these opinions, Dr. Skorich noted vision loss to Plaintiff's right eye due to a previous retinal detachment, and that Plaintiff had a retinal detachment in the left eye with peripheral vision loss. (R. 394.)

On July 16, 2017, Dr. Skorich also wrote a letter to Plaintiff's attorney in the present matter with respect to Plaintiff's application for Social Security Benefits. (R. 388.) With respect to Plaintiff's vision Dr. Skorich's opinion was as follows:

> His right eye had been legally blind and he developed a cataract in his left eye, which I treated successfully in November of 2013. On the right eye, we had previously done a procedure to remove the calcium deposits on his eye, and he ultimately had more surgery on his right eye with a secondary intraocular lens with anterior vitrectomy performed by me in March of 2014 and a corneal endothelial transplantation in his right eye in October of 2014. His best vision in his right eye stabilized at about 20/70 range with some spottiness to his vision due to his previous multiple retinal surgeries. There is no likelihood that his vision will improve better than that range in the right eye and it does fluctuate considerably over time, and at his last visit with me in March of 2017, his vision in the right eye was 20/200.

> He was also seen on several occasions in March by several physicians with onset of floaters in his better eye, which is his left eye. He ultimately ended up with a retinal detachment that has been treated by Dr. Galchus, and Dr. Galchus has seen him on numerous occasions between April 2017 to the

> present time. He has been treated with an additional retinal detachment
> repair and it looks like he will end up with good vision in his left eye, as long
> as he does not end up having more complications of the type that he had in
> his right eye.

(R. 388-89.) Dr. Skorich noted that in his last visit with Dr. Galchus, Plaintiff's vision

was 20/20- in his left eye and 20/125 in his right eye. (R. 389.) According to Dr.

Skorich, Plaintiff was still recovering from retinal detachment surgery on his left

eye, and due to the treatment of his retinal detachment, he would have some peripheral

vision issues in his left eye, which is his better eye. (R. 389.) His right eye would

continue to have subnormal vision. (R. 389.) While Dr. Skorich opined that Plaintiff

was unable to perform his previous employment as a professional driver, he did not

render any opinion as to whether Plaintiff could perform other types of jobs. (R. 389.)

On September 11, 2017, Plaintiff was seen for double vision. (R. 411.) Plaintiff

noted that he had felt as though his right eye was turning outward, which had been going

on for a few years. (R. 411.) Plaintiff reported that when he closed his left eye, the

double vision went away. (R. 411-12.) He noted that he did not use his right eye, as he

has poor vision due to all of the surgeries. (R. 411.) Dr. Thomas Shuey noted that the

main complaint was diplopia and that they would try alleviating this at distances with the

use of a prism with his glasses. (R. 414-15.) There was no guarantee that prism would

be effective. (R. 415.)

On November 11, 2017, Plaintiff reported seeing bright flashes that occurred just

once but were brighter than he had recently experienced. (R. 400.) His vision had been

relatively stable. (R. 400.) The was no mention of complaints for double vision. (R.

419.)  The impression was a possible retinal tear in the left eye and Plaintiff underwent prophylactic laser retinopexy in the left eye.  (R. 400.)

Plaintiff had ophthalmology follow-ups in December 2017 and on April 2018, where Plaintiff reported floaters in his left eye that came and went, but no further mentions of double vision or any other retinal tears.  (R. 445-48, 452-54.)

**B.    Testimony at the Hearing before the ALJ**

At the hearing before the ALJ, Plaintiff testified that his vision in right eye was very foggy and that he could hardly see through that eye.  (R. 44.)  With respect to his left eye, Plaintiff testified that there was a floater in the eye that required him to keep moving his eye in order to properly see.  (R. 44.)  Plaintiff complained that he did not have good peripheral vision with the floater, with more impact as to the right eye.  (R. 44.)  Plaintiff claimed that he had no depth perception because of the problems with right eye, making it hard for him to judge distance.  (R. 44-45.)  Plaintiff admitted that the surgery to his left eye put it almost back to where it was except for the floater, but that he could at least see out of the eye.  (R. 45.)  Plaintiff noted that he could read with his glasses but that he pretty much could not read fine print.  (R. 47.)  Plaintiff admitted that he could read the newspaper with the use of his reading glasses.  (R. 47.)  He also testified that he drove his own vehicle, albeit infrequently.  (R. 48.)  While he was able to watch television, he had to adjust his eyes due to a floater that would come into his field of vision.  (R. 48.)

VE Kimberly Eisenhuth also testified at the hearing before the ALJ.  (R. 52.)  The ALJ posed the following hypothetical individual:

> For the first hypothetical, assume an individual who can perform work at all exertional levels with the following additional limitations:

> May perform work that requires no more than frequent near acuity, far acuity, depth perception, accommodation, and field of vision; can only read 14-point font size or greater; no work that requires precise perception, such as threading a needle. The individual is able to avoid ordinary hazards in the work place and no work that requires driving or the operation of a motorized vehicle.

(R. 53-54.)

The VE testified that such a hypothetical person could not perform Plaintiff's prior relevant work as a commercial driver, but other work would remain including the jobs of cleaner / housekeeping (DOT 323.687-014), laundry worker II (DOT 361.685-018), and inspector hand packager (DOT 559.687-074). (R. 55.) According to the VE, her testimony was consistent with the DOT except:

> [F]or the no reading of less than a 14-point font. That is not specifically addressed within the DOT. And I am basing my opinion on my 20 years of experience as a qualified rehabilitation consultant. I have observed these jobs as well as placed individuals within them.
>
> Q And in your experience, none of those three jobs would require the reading of a font of smaller than that?
>
> A No, Your Honor.

(R. 55.)

When asked to consider positions for a hypothetical individual with all of these same limitations, but with an additional limitation of only "occasional" depth perception, the VE testified that the only position in the national economy that would fit within the confines of the hypothetical would be a "laundry worker II," a medium, unskilled position. (R. 56.) In response to a question from Plaintiff's counsel, the VE acknowledged that the labels on the type of cleaning products one might use as a laundry

worker would have instructions in smaller than 14-point font, although she did testify that the instructions could be demonstrated to them.  (R. 58-59.)

### III.    LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law.  *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  "'Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions.'"  *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)).  The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.*  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."  *Id.* (citation omitted).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).  Assessing and resolving credibility is a matter properly within the purview of the ALJ.  *See Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.").

## IV.    <u>DISCUSSION</u>

Plaintiff asserts that the RFC assigned to him by the ALJ is not supported by substantial evidence.  First, Plaintiff argues that the ALJ's RFC assessment that he could perform occupations that require "frequent" near acuity, far acuity, depth perception, accommodation, and field of vision are not supported by the medical evidence.  (Dkt. 13 at 11-13.)  Second, Plaintiff argues that the ALJ's finding that he is not disabled is not based on substantial evidence because an unresolved conflict exists between the Dictionary of Occupational Titles ("DOT") and the VE's testimony.  (Dkt. 13 at 13-14.)

## A.    **Whether the RFC is Supported by Substantial Evidence**

As set forth above, Plaintiff argues that the ALJ's assertion that he could perform occupations that require frequent near acuity, far acuity, depth perception, accommodation, and field of vision is not by supported substantial evidence.  In support of this argument, Plaintiff contends that the record supports the following: that he is legally blind in his one (right) eye; cannot engage in activities that require any depth perception, much less those that require that he engage in such activities for more than half of every work day; as confirmed by his treating provider he has a constant limited field of vision (peripheral vision) in both eyes; that based on his testimony at the hearing before the ALJ he has a constant floater in his "good" left eye making it seem as if he is "looking through a fog," thereby requiring him to constantly having to move his eye around to see around the floater; and claims that he struggles with double vision, which may not be amenable to correction.  (Dkt. 13 at 11.)  Plaintiff notes that while the ALJ claims to have given his treating provider Dr. Skorich significant weight, it is unclear

how the ALJ determined that an appropriate limitation in any of the five vision-related physical demands was a limitation to "frequent", as Dr. Skorich does not indicate in his opinions the degree to which Plaintiff is impaired in the areas of near acuity, far acuity, depth perception, accommodation, or field of vision—other than the general assertion that Plaintiff's vision as limited, without addressing what that entails, including whether Plaintiff had the residual capacity to engage in these visual tasks for up to two-thirds of the work day.  (Dkt. 13 at 12.)  Plaintiff argues that instead of seeking clarification from Dr. Skorich as the extent to which Plaintiff is limited in the areas of near acuity, far acuity, depth perception, accommodation, and field of vision, and whether he could reasonably engage in activities that required these physical demands at the frequency suggested by the ALJ, the ALJ impermissibly drew his own inference about Plaintiff's functional ability from ambiguous terms in a medical report.  (*Id.*)  According to Plaintiff, remand for a clarification is especially necessary in this case as he experienced additional complications with his left eye, including an additional retinal tear on the left and a new complaint of diploidic vision, after Dr. Skorich composed his letter and assessed Plaintiff's limitations.  (*Id.* at 12-13.)

Defendant counters that Plaintiff mischaracterizes the ALJ's RFC and appears to equate the ALJ's finding of frequent visual abilities as a finding of near unlimited visual abilities.  (Dkt. 15 at 7.)  Defendant argues that Plaintiff ignores that the ALJ qualified his findings to explain the limited visual activities Plaintiff could perform no more than frequently: including that Plaintiff could only read 14-point font type size or greater; could not perform work that required precise depth perception such as threading a needle;

14

and was able to avoid ordinary work hazards, but could not perform any work that required driving or the operating of a motorized vehicle. (*Id.* at 7-9.) Defendant further argues that the medical evidence in the record, including the opinions of the state agency physicians, support the ALJ's RFC. (*Id.* at 8-9.)

"A disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)). Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527). "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citation omitted) (highly unlikely that ALJ did not consider and reject physician's opinion when ALJ made specific references to other findings set forth in physician's notes).

The Court concludes that the ALJ's RFC is problematic with respect to the finding that Plaintiff "may perform work that requires no more than frequent . . . depth perception. . . [and] no work that requires precise depth perception such as threading a needle. . . ."[5] (R. 22.)  The Court does not understand how the ALJ came to this limitation for Plaintiff.  The ALJ cites to the opinions of the state agency physicians in support of his RFC:

> The undersigned has considered all of the evidence, including the opinions of the nonexamining state agency medical consultants, Dr. Grant and Dr. Phibbs, to the effect that records present in the case file at the initial and reconsideration levels showed a history of retinal detachment involving the right eye with multiple surgeries and that in April 2017 the claimant underwent surgery for retinal detachment the left eye.  Additionally, the consultants opined that, while the claimant was subject to no exertional limitations, he was subject to more-than-minimal limitations involving vision. (Exhibits 1A and 4A).  **The undersigned has accorded significant weight to these opinions that the claimant has no exertional limitations and that his only limitations are with vision.  However, the undersigned has given <u>somewhat more restrictive limitations</u>** based on records initially received at the hearing level, after the consultants completed their review of the file materials and offered their opinions.

(R. 25 (emphases added).)

However, the State Agency physicians, Dr. Grant and Dr. Phibbs, opined that Plaintiff's "perception was impaired due to asymmetric vision loss and that Plaintiff **<u>should avoid</u> work for which depth perception <u>is critical</u> for job performance and safety**."  (R. 71, 84 (emphases added).)  The ALJ also relied upon Plaintiff's treating provider Dr. Skorich's opinion that Plaintiff had some limitations as to depth perception,

---

[5]    "Depth Perception" is defined as follows: "Three-dimensional vision.  Ability to judge distances and spatial relationships so as to see objects where and as they actually are."  *Physical Demands*, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Appendix C.

noting that the opinion was general in that it only consisted of Dr. Skorich checking that Plaintiff was "LIMITED" in this category. (R. 25.) The Court acknowledges that the ALJ limited the RFC to exclude any work that requires precise depth perception such as threading a needle. (R. 22.) That said, Dr. Grant, Dr. Phibbs, and Dr. Skorich did not distinguish between "precise" depth perception or other forms of depth perception in their opinions. Indeed, Dr. Grant's and Dr. Phibbs' limitations for Plaintiff applied to positions where depth perception was critical. In his RFC, the ALJ found that Plaintiff could perform no more than frequent depth perception (save for precise perception), but did not define what "frequent" means. The Commissioner has consistently defined "frequent" as activity that exists from one-third up to two-thirds of the time. *See, generally,* S.S.R. 96-9p, 1996 WL 374185, at *3 (July 2, 1996); SSR 85-15, 1985 WL 56857 at *7 (S.S.A. 1985). Regardless of the exclusion of precise depth perception by the ALJ (which is in and of itself vague), it is hard to argue that a job that requires depth perception up to two thirds of the day means that depth perception is not "critical to job performance," making the RFC inconsistent with the opinions of the medical providers that the ALJ relied upon.

Even with respect to the alternative hypothetical provided by the ALJ to the VE, which changed "frequent" depth perception limitation to only "occasional" depth perception (R. 56),[6] the Commissioner has consistently defined "occasional" as activity

---

[6]    The Court notes that when the ALJ posed this hypothetical, the VE testified that the only job that such a person could perform out of the 3 positions set forth by the VE was the Laundry Worker II, DOT code 361.685-018. (R. 56.) The Dictionary of Occupational Titles provides that such a person performing this position "[m]ay mend torn articles, using needle and thread." DOT 361.685-018 LAUNDRY WORKER II,

occurring from very little up to one-third of the time.  *See, e.g.*, S.S.R. 83-10, 1983 WL

31251, at \*4 (Jan. 1, 1983); S.S.R. 96-9p, 1996 WL 374185, at \*3 (July 2, 1996).  Again,

the Court cannot find that a job function that can comprise up to one-third  of the

employee's job is not critical to that position.

> The Court acknowledges that ALJ noted that his:

> [F]indings, concerning the claimant's residual functional capacity, are
> generally consistent with the evidence overall, including the objective the
> evidence [sic] as it pertains to the claimant's corrected visual acuity and
> peripheral vision, the current course of treatment which involves only
> monitoring, and the claimant's own reports of functioning including being
> able to watch television, read newsprint, and drive.  The record taken as a
> whole supports the finding that claimant can perform work at all exertional
> levels subject only to visional limitations set forth in the residual functional
> capacity.

(R. 25.)

> However, as it relates to depth perception, the only objective medical evidence in

the record is that Plaintiff was legally blind in his right eye with a vision rating

fluctuating between 20/125 to 20/200 vision in 2017 (*see, e.g.*, R. 371, 373, 379, 383-82,

388-89), and that his right eye would continue to be subnormal (R. 389).  The State

---

1991 WL 672987.  This is contrary to the ALJ's RFC including the limitation that
Plaintiff cannot thread a needle or engage in any precise depth perception work.  (R. 22.)
The ALJ did not address this conflict with the VE and therefore, the ALJ could not rely
on the VE's testimony as to her opinion that Plaintiff could perform this position.  *See
Kemp v. Colvin*, 743 F.3d 630, 633 (8th Cir. 2014) (remanding denial of benefits because
"the record does not reflect whether the VE or the ALJ even recognized the possible
conflict between the hypothetical" and the recommended job); *see also Thomas v.
Berryhill*, 881 F.3d 672, 677 (8th Cir. 2018) ("The Commissioner has ruled that an ALJ
may not rely on a vocational expert's testimony about the requirements of a job if an
'apparent unresolved conflict' exists between that testimony and the job's description in
the [DOT]." (citing *Moore v. Colvin*, 769 F.3d 987, 989–90 (8th Cir. 2014), quoting SSR
00-4p, 2000 WL 1898704, at \*2 (Dec. 4, 2000)).

Agency physicians noted that Plaintiff's depth perception issues were caused by "asymmetrical vision loss" as the result of his right eye. (R. 71, 84.) Plaintiff himself testified that he had no depth perception because of the problems with his right eye, making it hard for him to judge distance. (R. 44-45.) In the medical record, Plaintiff claimed that he did not use his right eye, as he has poor vision due to all of the surgeries. (R. 411.) Plaintiff's testimony that he drives a car at times (R. 48) ignores the fact that the ALJ concluded that he should not engage in such activity as part of his employment (R. 22, 53-54). Based on the fact that the cause of the asymmetry affecting Plaintiff's depth perception has not been fixed, the fact that the right eye will continue to be subnormal despite treatment, and the opinions of the experts (including the state agency experts), the Court finds that the ALJ's RFC as to depth perception is not supported by substantial evidence based on the present record.

That said, the opinions from Dr. Grant, Dr. Phibbs, and Dr. Skorich are vague with respect to depth perception. There is no indication from the opinions of Dr. Grant or Dr. Phibbs what frequency or type of depth perception Plaintiff is capable of given his severe impairments to his vision. While they provide that Plaintiff should not work in employment where depth perception is "critical", it unclear what amount of depth perception requirement (*e.g*, up to one-sixty-fourth, one-twelfth, or one-third of the time) would be considered critical. Similarly, as the ALJ noted, Dr. Skorich only opined that Plaintiff was "limited" as to his ability to engage in depth perception of any type without any explanation. Remand is appropriate when an incomplete record causes a claimant to be treated unfairly or prejudiced. *See Highfill v. Bowen*, 832 F.2d 112, 115 (8th Cir.

1987) (evidence "put the ALJ on notice of the need for further inquiry").  It appears from the RFC that the ALJ drew upon his own inferences from the ambiguous medical opinions to develop the RFC as it pertains to depth perception.  "[A]n administrative law judge may not draw upon his own inferences from medical reports."  *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003) (quoting *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975)).  The ALJ has a duty to fully and fairly develop the record.  *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995) (finding that an ALJ must fully and fairly develop the record so that a just determination of disability may be made).  The Court finds that this matter should be remanded back to the ALJ to develop the record (whether it be through Plaintiff's treating providers, other medical experts, additional medical records, or some combination thereof), to determine the extent of Plaintiff's impairment caused by his asymmetrical vision as it relates to his depth perception in evaluating his RFC, and, if the evidence warrants, frame a revised hypothetical question to a vocational expert, making sure to address any inconsistencies between the VE's resulting testimony and the DOT.  *See Smith v. Barnhart*, 435 F.3d 926, 931 (8th Cir. 2006).

**B.    Conclusion**

The Court finds that this case should be remanded back to the ALJ consistent with this Report and Recommendation.

## V.    <u>RECOMMENDATION</u>

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff Daniel E.S.'s Motion for Summary Judgment (Dkt. 12) be

**GRANTED IN PART and DENIED IN PART**;

2.      This case be **REMANDED** to the Commissioner pursuant to sentence four

of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Report

and Recommendation;

3.      Defendant Commissioner of Social Security Andrew Saul's ("Defendant")

Motion for Summary Judgment (Dkt. 14) be **DENIED**; and

4.      That this case is **DISMISSED WITH PREJUDICE**.


DATED: January 28, 2020                         _s/Elizabeth Cowan Wright_
                                                ELIZABETH COWAN WRIGHT
                                                United States Magistrate Judge




## **NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).